# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Zagel | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3787 | **DATE** | 11/8/2002 |
| **CASE TITLE** | DUNN, ET AL vs. CITY OF ELGIN | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Motion (39-1) for summary judgment is granted. Motion (43-1) for summary judgment is denied.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | NOV 18 2002 | 64 |
| ✓ | Docketing to mail notices. | date docketed | |
| ✓ | Mail AO 450 form. | 6 | |
| | Copy to judge/magistrate judge. | docketing deputy initials | |
| | | U.S. DISTRICT COURT CLERK | date mailed notice |
| DW | courtroom deputy's initials | 02 NOV 17 PM 2: 31 | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NATASHA A. DUNN and KATIA S.
DUNN, a minor by her parent and next
friend, Natasha A. Dunn,

      Plaintiffs,

      v.

CITY OF ELGIN, ILLINOIS; JASON A.
LENTZ; individually and in his official
capacity as a police officer for the City of
Elgin, Illinois; KEITH B. CHRASTKA,
individually and in his official capacity as a
police officer for the City of Elgin, Illinois;
MONA S. McKINLEY, individually and in
her official capacity as a police officer for
the City of Elgin, Illinois.

      Defendants.

DOCKETED

NOV 1 8 2002

No. 00 C 3787
Judge James B. Zagel

## <u>MEMORANDUM OPINION AND ORDER</u>

Natasha Dunn, on behalf of herself and her minor daughter Katia, has filed suit against

the City of Elgin and Elgin police officers Jason Lentz, Keith Chrastka, and Mona McKinley.

Dunn seeks relief under 42 U.S.C. § 1983 and Illinois law on the basis that the Defendants

violated her constitutional rights and caused her severe emotional distress when they removed

Katia from her custody pursuant to a North Carolina court order. Defendants have moved for

summary judgment on all counts. Summary judgment is appropriate if, after drawing all

reasonable inferences in favor of the nonmoving party, there is no genuine issue of material fact

and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Juarez v.*

*Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 320 (7th Cir. 1992). The question is

thus "whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

This dispute dates back to Natasha's divorce from her husband Christian. For the purposes of summary judgment, I assume that the following is true. After Natasha filed the divorce petition in Illinois, Christian filed a motion in North Carolina seeking custody of Katia. On February 4, 2000, a North Carolina judge issued an *ex parte* order awarding temporary custody of Katia to Christian. Shortly thereafter, Christian returned to Elgin, Illinois where he enlisted the help of the Elgin Police Department in enforcing the court order. Pursuant to an unwritten policy of the Elgin Police Department, police officers may be required to provide "stand-by service" to the public. Although the intended purpose of stand-by service is "keeping the peace," the service has been used in conjunction with bank runs, property exchanges, and orders of protection. In addition, under the policies of the Elgin Police Department, officers may be required to provide stand-by service during child custody exchanges pursuant to a court order. However, Standard Operating Procedure 74.2 of the Elgin Police Department generally prohibits officers from enforcing civil court orders absent specific direction from a supervisor, and Elgin police officers are generally not called upon to enforce civil court orders. Elgin police officers have no formal training whatsoever concerning the meaning or application of stand-by policy, notwithstanding the fact that such service is a frequent recurring duty of Elgin police officers. In field training, officers are verbally told that stand-by service is a peacekeeping role, but there is no additional training.

Early on the morning of February 6, Sergeant McKinley directed Officers Chrastka and Lentz to engage in stand-by service at Natasha's home in connection with Christian's custody

order. When Chrastka examined the court order, he realized that it was not issued by an Illinois court, but he and Lentz enforced it nonetheless. Upon arrival at her home, the officers began pounding violently on the door, which was eventually answered by the owner. Chrastka announced to him that the officers were there to serve Natasha with papers. When she came to the door, she saw that the men were police officers but did not attempt to prevent them from entering the home. The officers told Natasha they were there to take Katia pursuant to a North Carolina custody order; they told her that she must hand Katia over to them. Chrastka threatened that if she refused, they would take Katia from her. Natasha became frantic, confused and upset and began crying. She then asked to see a copy of the order. Lentz held out the multipage order, open to the last page. The officers stated that they were going to enforce the order despite her objections that out-of-state custody orders were not enforceable. Chrastka told Natasha that there was nothing she could do to prevent them, not even call her father, a former policeman. Chrastka thereupon seized Katia, who began crying. Chrastka took Katia outside and gave her to Christian and a female companion.

## Count I: First Amendment, Fourth Amendment, and Due Process Clause Failure to Train and Supervise Against City of Elgin

A municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation. *Monell v. Dept. of Social Services*, 436 U.S. 658, 694 (1978). It is only when the "execution of a government's policy or custom . . . inflicts the injury" that it may be held liable under § 1983. *Id.* Regarding the present allegations, "inadequacy of police training may serve as a basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of the persons with whom the police come into contact."

3

*City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). This standard is met where "in light

of the duties assigned to specific officers or employees the need for more or different training is

. . . obvious," and the existing inadequacy is "likely to result in the violation of constitutional

rights." *Id.* at 390. "A municipality would thus evince a deliberate indifference to the

constitutional rights of its citizens by failing to train its employees 'with respect to a clear

constitutional duty implicated in recurrent situations that a particular employee is certain to face.'

It would also be deliberately indifferent if it failed to provide further training after learning of a

pattern of constitutional violations involving the exercise of police discretion. Under either

scenario, the finding of 'deliberate indifference' is derived from the City's failure to act in the

face of 'actual or constructive notice' that such a failure is likely to result in constitutional

deprivations." *Robles v. City of Fort Wayne*, 113 F.3d 732, 735 (7th Cir. 1997) (omitting internal

citations) (quoting *Cornfield v. Consolidated High School Dist. No. 230*, 991 F.2d 1316, 1327

(7th Cir. 1993)). The Seventh Circuit has held that a city's failure to train "would rise to the

level of deliberate indifference only if it were aware of a series of constitutional violations

occurring while its police officers were performing" the conduct for which it alleged they have

not been trained. *Robles*, 113 F.3d at 736; *see also Roach v. City of Evansville*, 111 F.3d 544,

549-50 (7th Cir. 1997); *Hirsch v. Burke*, 40 F.3d 900, 904-05 (7th Cir. 1994).

Here, Natasha argues that Elgin was deliberately indifferent by failing to train its officers

regarding "standby service." Particularly, she insists that Elgin should have instructed its officers

that performing stand-by service did not permit them to enforce out-of-state civil orders or at the

least did not permit them to do so in such a way as to violate constitutional rights. It is not

obvious to me that such an instruction is required in order to avoid having Elgin police officers

4

violate the constitutional rights of citizens with whom they come into contact while performing

stand-by service. What is most damning to this count, however, is that even if Natasha could

prove everything that she has alleged regarding the violations of her and Katia's constitutional

rights as a result of Elgin's failure to train its officers regarding stand-by service, she has, as in

*Robles*, produced no evidence of a "*pattern* of similar violations or of the City's *awareness* of

that pattern." *Robles*, 113 F.3d at 736 (emphasis added). She cannot show, as a matter of law,

that Elgin was deliberately indifferent to any need for training on stand-by service, and thus,

summary judgment in favor of Elgin is granted.

Counts II, III, and IV: Absolute Immunity

Non-judicial officials whose official duties have an integral relationship with the judicial

process are entitled to absolute immunity for their quasi-judicial conduct. *Morrell v. Mock*, No.

99 C 2459, 2000 WL 97535, *3 (N.D. Ill. Jan. 25, 2000), *aff'd*, 270 F.3d 1090 (7th Cir. 2001),

*cert den.*, 70 USLW 3597 (Oct. 7, 2002) (citing *Henry v. Farmers City State Bank*, 808 F.2d

1228, 1238-39 (7th Cir. 1986)); *see also, Ashbrook v. Hoffman*, 617 F.2d 474, 476 (7th. Cir.

1980) (finding that individuals performing ministerial acts under a judge's supervision and

intimately related to judicial proceedings have quasi-judicial immunity). The Seventh Circuit

revisited this doctrine of immunity in *Wollin v. Gondert*, 192 F.3d 616 (7th Cir. 1999),[1] where it

explained that two deputies who had arrested the plaintiff pursuant to instructions from the

County Family Court Commissioner were entitled to immunity to under *Henry* because they were

"executing a directive issued by a trained and licensed practitioner of the law and duly appointed

---

[1] While the Court did not specifically state that its decision rested on absolute immunity
grounds, it approvingly relied on *Henry*'s absolute immunity analysis. 808 F.2d at 624-25.

officer of the court," and they could not be required to second guess the order unless they "clearly" knew the order was "outside the range of the Commissioner's professional competence" or believed that the order constituted "an unacceptable error indicating gross incompetence or neglect of duty," *id.* at 624-25. Such "gross incompetence or neglect of duty" was not present. *Id.* at 625-26. This Court has also recently visited the issue of absolute in *Morrell*, where the Court held that two deputies who had seized a child from her mother, pursuant to a facially valid New Mexico court order were entitled to absolute immunity. 2000 WL 97535 at *3.

Although reliance on a court order will not shield officers from liability where the order is "obviously invalid" on its face, *see id.* at *4, there is nothing in the record to reflect that the North Carolina order here was obviously invalid. There are circumstances under which a court could validly order a child from its mother for the purpose of determining custody. *See id.* In addition, the order did not in any way appear incomplete or invalid on its face so that an inference could be made that the judge who issued it made "an unacceptable error indicating gross incompetence or neglect of duty." *See Wollin*, 192 F.3d at 624; *see also Morrell*, 2000 WL 97535, at **3-4 (court order authorizing officials to transfer custody of baby facially valid). The court order was eight pages long, provided a detailed description of how Natasha had deliberately failed to abide by the court's previous orders regarding the custody of her child, and contained the judge's signature, a date, and a North Carolina file stamp. Additionally, the court order indicated that the North Carolina court had jurisdiction over the parties, that Natasha had notice of the hearing, and that she was willfully failing to participate in the process. Finally, the order directed "any and all law enforcement officers to serve and render any possible insistence to aid

6

and assist" Christian in obtaining custody of Katia. Under these circumstances, the officers were

not obligated to conduct any more inquiry into the validity of the order before acting on it. *See*

*Henry*, 808 F.2d at 1239.[2] In fact, it "would be wholly unreasonable to expect the officers to

thoroughly second guess . . . the issuing court." *Morrell*, 2000 WL 97535 at *4. Any questions

concerning the ultimate legality of the order were issues to be decided by the North Carolina

court, per the order itself, at a hearing to be held ten days after the order was entered, not by the

Defendants. *See id.* The Defendants' only role was to follow the direction of the order, an act

for which they are entitled to absolute immunity. *Id.* The Plaintiffs argue that the order was

facially invalid because it did not indicate that it had been filed with an Illinois court pursuant to

Illinois law. However, to be facially invalid, an order must be *obviously* invalid. Any failure to

comply with procedural requirements regarding the enforcement of out-of-state orders is not

sufficient in itself to render the order facially (*i.e.*, obviously) invalid.[3] Consequently, summary

judgment is granted in favor of the Defendants on Counts II, III, and IV.

---

[2] Natasha attempts to distinguish *Morrell* by noting that unlike the present case, the deputies in *Morrell* made reasonable attempts to verify the enforceability of the New Mexico order and relied upon the legal advice of assistant state's attorneys regarding the order's validity. I find, however, that these facts were merely additional, rather than necessary factors that allowed the court to find immunity. In other words, were those factors to be absent in *Morrell*, the deputies would nonetheless be entitled to immunity on the sole basis of the facially valid order.

[3] Natasha also argues that the North Carolina order was substantively invalid because she was not given an opportunity to challenge the out-of-state court's jurisdiction. However, *Morrell* – the case which Natasha claims establishes this right to challenge the court's jurisdiction – was not decided until 2001. Therefore, Natasha's alleged right to challenge jurisdiction had not been established in 2000 – the year in which the court issued the order – and thus while she could have challenged the court's jurisdiction at that time under the rule later established in *Morrell*, the validity of her challenge would not have been apparent to any of the Defendants.

<u>Count V: Intentional Infliction of Emotion Distress Against Defendants Lentz, Chrastka, and</u>

<u>McKinley</u>

To state a cause of action for intentional infliction of emotional distress under Illinois

law, a plaintiff must prove that the conduct at issue was extreme and outrageous. *See Debolt v.*

*Mutual of Omaha*, 371 N.E.2d 373, 375 (Ill. App. Ct. 1978). Extreme and outrageous conduct is

conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible

bounds of decency." *Public Finance Corp. v. Davis*, 360 N.E.2d 765, 767 (Ill. 1976). Here, the

Defendants' conduct in enforcing the facially valid court order does not amount to objectionably

unreasonable behavior. Accordingly, their actions do not constitute extreme and outrageous

behavior. Therefore, I grant summary judgment in favor of Lentz and Chrastka on this claim. I

additionally grant summary judgment in favor of McKinley because Natasha concedes that the

evidence is insufficient to support this claim against her.

ENTER:

James B. Zagel
United States District Judge

DATE: _8 Nov 2002_